PATRICK D. ROBBINS (CABN 152288)
United States Attorney

MARTHA A. BOERSCH (CABN 126569)
Chief, Criminal Division

DANIEL N. KASSABIAN (CABN 215249)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7034
    Fax: (415) 436-7234
    daniel.kassabian@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>EMER ADONY MEJIA-ZERON,<br><br>    Defendant. | NO. CR 24-00386-TLT<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Judge: The Honorable Trina L. Thompson<br>Date   May 16, 2026<br>Time: 9:00 am<br>Ctrm: 9, 19th Fl |

### I. SYNOPSIS

Defendant Emer Adony Mejia-Zeron comes before this Court for his sentencing, having pleaded guilty to two counts of violating 21 U.S.C. § 841(a)(1) and (b)(1)(C); one count for distribution of fentanyl, and the other count for possession with intent to distribute fentanyl. The charges reflect what this young man did on April 11, 2024: sold deadly fentanyl to an undercover officer from a stash of fentanyl and other drugs he had for sale and that he had hidden in the wheel well of a car. He did this in the Tenderloin, just a block from this courthouse, an area that is the epicenter of the fentanyl epidemic that affects the most vulnerable members of our community. Mr. Mejia-Zeron will seek a low sentence, possibly time-served, asking the Court to consider *his* circumstances, but effectively failing to take responsibility for his impact on others.

  <u>The government recommends a sentence of 19 months of imprisonment.</u>  This sentence is the average length of imprisonment imposed for defendants who are similarly situated (same offense level, CHC, drug sold) across the country, per Judiciary Sentencing Information (JSIN).  This is also in-line with the 18 months of imprisonment recommended by the U.S. Probation Office (USPO) in the Pre-Sentence Investigation Report (PSR).  This sentence adequately reflects the gravity of Mr. Mejia-Zeron's conduct and the significant reduction, of 5 offense levels, for mitigating factors recognized by the guidelines.  The Court imposing a 19-month sentence also is just, unpersuaded by the mere fact of this defendant's youth or tales of his own struggles untethered to his conduct that harmed others for pecuniary gain.  This sentence is necessary to deter others like this defendant, who are selling fentanyl that undoubtedly brings death to our community.  This imprisonment term is sufficient but no greater than necessary to meet the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

  The government also anticipates that defense will argue a time-served sentence, or close to it, is appropriate in light of the government's Fast Track program that is offered to many drug dealers arrested in the Tenderloin neighborhood of San Francisco, just like this defendant.  But this is not a Fast Track situation, where those defendants take immediate responsibility, remain in custody from offense through to sentencing, and agree to several waivers—including to appeal the judgement—and conditions in a plea agreement.  Mr. Mejia-Zeron did nothing of the sort.  Moreover, additional investigation revealed additional facts about Mr. Mejia-Zeron's conduct that can be considered under § 3553(a).  Critically, any consideration of Fast Track offers is tantamount to seeking to introduce plea negotiations, which is not permitted under Federal Rule of Evidence 408.  Finally, Ninth Circuit law recognizes that fast track programs create disparities that are not *unwarranted*, and defendants, like Mr. Mejia-Zeron, are not entitled to downward departures just because they are not sentenced pursuant to those programs.

**II. THE DEFENDANT'S ARREST IN 2022 DOES NOT DETER HIM FROM CRIMINAL ACTIVITY THAT PUTS HIS IMMIGRATION STATUS IN JEOPARDY**

  On January 4, 2022, Mr. Mejia-Zeron was arrested in San Jose for Possession of Burglary Tools, but charges were not filed.  *See* PSR ¶ 36.  Per the Santa Clara County DA's Office, Mr. Mejia-Zeron was in possession of Sawzall blades and reciprocating saws, which are commonly used for the theft of catalytic converters from the bottom of vehicles, in suspicious circumstances.  But this was insufficient

to prove that tools were possessed for purpose of burglary (i.e., to gain *entry into* a building or vehicle).

For the purposes of this case, it is significant that Mr. Mejia-Zeron was arrested but avoided prosecution, and thus did not jeopardize his immigration status. His petition for Special Immigrant Juvenile (I-360) status was approved on June 20, 2020 (1½ years earlier), and he was then granted Deferred Action on May 12, 2022 (4 months after this arrest), thus becoming eligible to be a Permanent Resident. So, Mr. Mejia-Zeron's arrest in San Jose should have served as a warning to have him stop engaging in criminal behavior and to not jeopardize his lawful immigration any further. Unfortunately, it did not deter him.

### III. THE DEFENDANT'S DRUG TRAFFICKING LEADING UP TO HIS ARREST FOR THE OFFENSE CONDUCT

Mr. Mejia-Zeron's Samsung telephone was seized during his arrest on April 11, 2024, and its contents analyzed. *See* PSR ¶ 13. More specifically, Drug Enforcement Administration Special Agent Hakeem Oduniyi—an expert in drug trafficking given his dozens of investigations, including multiple telephone wiretaps, into drug trafficking—reviewed the contents of the Samsung telephone and noted the following evidence of drug trafficking and other criminal conduct during Mr. Mejia-Zeron's use of that telephone from January 12, 2024 to April 11, 2024 (i.e., 4 months).

The Samsung telephone has a text message string between Mr. Mejia-Zeron and "14157568229 Kelly Fedy" in which Mr. Mejia-Zeron was selling fentanyl to Kelly Fedy. In particular, in the messages between them on March 25, 2024 through April 10, 2024, Mr. Mejia-Zeron offered to sell an "ounce" for "200" dollars to Kelly Fedy, who asked in response if its "really white," which is a reference to the fentanyl's potency. When Mr. Mejia-Zeron confirmed, Kelly Fedy stated that he wanted "a little at first because I don't want to buy a lot of stuff I don't like," which is typical of a buyer who wants to sample the specific fentanyl before buying more significant amounts. Mr. Mejia-Zeron then asked "how many grams do you want?" Kelly Fedy responded, "Just 2 so I can try it tonight," and then that he would like "two ounces but probably three" if he liked it. Given that (1) Mr. Mejia-Zeron stated a price of $200 an ounce, (2) Kelly Fedy indicated a willingness to buy 2 or 3 ounces, and (3) Mr. Mejia-Zeron did not respond by indicating any hesitation, delay, or difficulty in providing those amounts, it is SA Oduniyi's opinion that Mr. Mejia-Zeron was able to provide up to 3 ounces of fentanyl

1 at that time, in late March/early April 2024. Of note, another indication of the substance being fentanyl is the telephone's identification of the other party as Kelly "Fedy," where Fedy is used to denote fentanyl, similar to the use of the term "fetty" which is commonly used for fentanyl.

The Samsung telephone also has a text message string between Mr. Mejia-Zeron and "16284682117 Jc Crys" in which Mr. Mejia-Zeron was attempting to sell methamphetamine to Jc Crys on March 18, 2024. In particular, Mr. Mejia-Zeron sent a text message to Jc Crys asking "Want some crystal today," where "crystal" is a common term for crystal methamphetamine. In a text that followed, Mr. Mejia-Zeron confirmed that he "got a big rock of cristal today," where "cristal" is a misspelling of crystal and references crystal methamphetamine, which can be in large crystal (i.e., rock) form, versus a crystalline powder form. And again, Mr. Mejia-Zeron's identification of the other person "Jc Crys" in the telephone, where "Crys" appear to reference crystal methamphetamine, is consistent with Mr. Mejia Zeron identifying buyers by the controlled substance they purchase.

In another text message string between Mr. Mejia-Zeron and "16282685986 20 Monster," Mr. Mejia-Zeron was attempting to sell a controlled substance to 20 Monster on March 17, 2024 to March 27, 2024. In particular, Mr. Mejia-Zeron sent a text message to 20 Monster that asked "u need something"? 20 Monster responded that unless he has cash, he needed Mr. Mejia-Zeron to "front me a dime until later tonight." Based on the use of the drug term "dime," 20 Monster asked for 10 dollars' worth of a controlled substance that 20 Monster would pay Mr. Mejia-Zeron for later. Mr. Mejia-Zeron responded that he was not going to be out all night, but could meet to give a "dime" of a controlled substance to 20 Monster. In the two messages that follow, Mr. Mejia-Zeron sent a voice message again offering the dime, and noting he was available in San Francisco and asking if 20 Monster was coming to meet him. In the remaining text messages, Mr. Mejia-Zeron and 20 Monster coordinate such that 20 Monster was trying to meet with Mr. Mejia Zeron to provide 20 Monster the controlled substance.

In two other sets of messages on the Samsung phone—one a Facebook Messenger string and the other a WhatsApp message string—Mr. Mejia-Zeron used the terms "clean" and "limpio," which is clean in Spanish, consistent with referring to fentanyl, to discuss purchasing fentanyl, and Mr. Mejia-Zeron sent a photo of what appears to be a package of powder fentanyl. Similarly, in another Facebook Messenger string, Mr. Mejia-Zeron uses the terms "crystal" and "cristal," consistent with referring to

methamphetamine, and stated in Spanish that he did not know who has methamphetamine, and possibly discussed someone else being a source of methamphetamine.

Finally, in another Facebook Messenger string in the Samsung phone, Mr. Mejia-Zeron sent a picture of what appears to be a semiautomatic pistol, and asked in Spanish how much is this "9," which was referencing a 9 mm semiautomatic pistol consistent with the photo. The person responding, identified as "100003910483082 Harold Lopez," stated in Spanish that it will cost "600" or "500" depending on "how it is"—i.e., its condition, and consistent with the price of illegal firearms in this area. It appears that there were further discussions between them about buying or selling such a firearm. The acquisition of a firearm by Mr. Mejia-Zeron is consistent with a drug dealer acquiring firearms for protection while selling drugs.

### IV.  OFFENSE CONDUCT

#### A.  The Defendant Sells Fentanyl On April 11, 2024 (Count 1)

As discussed in the PSR, Mr. Mejia-Zeron sold twenty dollars' worth of fentanyl to an undercover police officet at around 11 pm, on Eddy Street between Polk Street and Van Ness Avenue, in the Tenderloin neighborhood. In selling to the undercover, Mr. Mejia-Zeron asked him "Policia?"—i.e., are you police? It was a fair question given that the officer did not look like the typical addicts in the Tenderloin, suffering from homelessness. The undercover denied being police, and explained he was buying drugs for his girl down the street. Mr. Mejia-Zeron, given his desire to make the sale, then proceeded to retrieve the fentanyl from a bag in the wheel well of a nearby SUV, and gave the undercover a piece of fentanyl in exchange for $20. Subsequent testing of the substance confirmed it was 0.282 grams (i.e., 282 milligrams) of fentanyl. By way of comparison, just <u>2 milligrams of fentanyl</u> is potentially lethal.[1] Soon after the sale, uniformed officers arrived to arrest Mejia-Zeron. He fled and was eventually apprehended at the end of the block, at Eddy Street and Van Ness Avenue.

#### B.  The Defendant Possesses Drugs For Sale April 11, 2024 (Count 2)

After arresting Mr. Mejia-Zeron, officers located a black plastic bag within a wheel well of a vehicle parked between Van Ness Avenue and Polk Street on Eddy Street—the same plastic bag from which Mr. Mejia-Zeron procured the fentanyl that he sold to the undercover. *See* PSR ¶ 10. As a result

---

[1] DEA Facts About Fentanyl *available at* https://www.dea.gov/resources/facts-about-fentanyl.

of the parties' agreement, Mr. Mejia-Zeron is being held responsible for the drugs found in the bag as follows: (1) 28.16 grams of fentanyl; (2) 28.90 grams of methamphetamine; (3) 13.80 grams of cocaine base; and (4) 0.97 grams of heroin.  *See id*.  ¶ 12.

## V. THE DEFENDANT'S CRIME IS SERIOUS, AND THE COMMUNITY NEEDS PROTECTION BY DETERING PROLIFIC DRUG DEALERS LIKE HIM

Mr. Mejia-Zeron's conduct was driven by the simple need for pecuniary gain—he sold drugs to make money, and not to feed his own addiction or some other mitigating circumstance.  Mr. Mejia-Zeron might argue that he *needed* to make money for his family.  But at what cost to society?  The effect of his conduct—selling to drug addicts facing homelessness, and mental and physical health maladies—is inescapable to even the most casual observer who walks the streets of the Tenderloin neighborhood that surrounds the federal courthouse in San Francisco.  These human beings are derided as "zombies" because their addictions have robbed them of their free will—and those are the survivors.  Per his phones' text messages, Mr. Mejia-Zeron sold fentanyl for months before his arrest.

Author and journalist Sam Quinones, who presented to the local Federal Bar Association in 2023,[2] aptly analogized selling fentanyl as "shooting into a crowd" given the foreseeable and potentially lethal impact.  Mr. Mejia-Zeron was comfortable making a living from this tragedy that has become a crisis in San Francisco.  A fentanyl-fueled crisis has led to the overdose deaths of hundreds of San Franciscans, with 635 overdose deaths in 2024, the year Mr. Mejia-Zeron was arrested.[3]  To be sure, Mr. Mejia-Zeron is not solely responsible for this broader societal problem.  But he acted with indifference to his own role that is necessarily in furtherance of it, plaguing the Tenderloin neighborhood of San Francisco where he plied his trade.  His conduct must be viewed in context.

## VI. SENTENCING GUIDELINES CALCULATION

The government agrees with the Guidelines offense level calculation in the PSR for Mr. Mejia-Zeron with a Total Offense Level of 19.  *See* PSR ¶ 28.  Because he is a Criminal History Category

---

[2] The program was *The Fentanyl Public Health Crisis: A Conversation with Journalist and Author Sam Quinones* and took place virtually and live at the San Francisco Federal Courthouse on June 12, 2023.  *See* https://www.fedbar.org/event/northern-district-of-california-chapter-the-fentanyl-public-health-crisis-a-conversation-with-journalist-and-author-sam-quinones/.

[3] City and County of San Francisco Report on 2024 Accidental Overdose Deaths *available at* https://media.api.sf.gov/documents/2024_OCME_Overdose_Report.pdf

U.S.' SENTENCING MEMO.                6
Case No. 24-00386-TLT

(CHC) of I, *see id.* ¶ 32, the Guidelines range Mr. Mejia-Zeron is 30-37 months of imprisonment, *see id.* ¶ 58.  Given that he pled open, the government made no promises as to its recommendation to the Court.

## VII. SENTENCING RECOMMENDATION

### A. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007).  The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary."  *Carty*, 520 F.3d at 991 (citation omitted).  In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

- the nature and circumstances of the offense and the history and characteristics of the defendant;
- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- the need for the sentence imposed to afford adequate deterrence to criminal conduct; and
- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. The Defendant's Instant Offenses And Related Criminal Conduct Call For A Sentence That Will Protect The Community And Actually Deter Him

The evidence summarized above shows that Mr. Mejia-Zeron did more than just a controlled-buy to an undercover officer.  A rational inference is that he spent the months leading up to his arrest selling fentanyl in the Tenderloin neighborhood, risking that he would place himself and his family in a dire situation should he be arrested, and undeterred by his prior arrest.  Trying to support a family is commendable, but for the fact that he sold deadly poison to do it, which makes it abhorrent.

The nature and circumstances of these offenses, and the need to impose a sentence that reflects the seriousness of these offenses, show that a 19-month sentence is appropriate.  Just as paramount is the need to deter others, like Mr. Mejia-Zeron, and sufficiently punish drug dealers that harm others in our society—including those who are most impoverished and suffering— to make money.

The counterpoints of the defendant's history and youth, or *unwarranted* sentencing disparities

with other drug dealers arrested in the Tenderloin neighborhood, are unavailing here. Youth alone is not a valid basis for leniency. If that youth, along with other factors, were tied to the underdevelopment of maturation, it might be a consideration. But per his text messages here, it is clear that Mr. Mejia-Zeron is not misguided, but instead calculating in making a knowing decision to take advantage of those around him here, to take care of his family. Nor is his own history of personal struggle—recounted during his PSR interview without any corroboration and with details that are offered only to pull at heartstrings—pertinent to the conduct before this Court. It stands against reason that someone who is subjected to harm by others, persists in his own criminal behavior to harm others.

Should Mr. Mejia-Zeron provide this Court with information about the government's offer in this or other cases—under the guise of seeking to avoid unwarranted sentencing disparities—then this Court should reject such efforts and specifically exclude such evidence as inadmissible. The government's offers of early resolution are those of compromise—weighing various interests beyond those in 18 U.S.C. § 3553(a)—and are generally inadmissible when used against the government. *See* Fed. R. Evid. 408. While there is a circuit split on whether Rule 408 applies to criminal cases at all, and the Ninth Circuit has yet to weigh-in, at least one court in this circuit has held that the rule does apply to criminal cases too. *See United States v. Christensen*, No. CR-14-08164-PCT-DGC, 2016 WL 1753600, at *3 (D. Ariz. May 3, 2016). As stated in that court's opinion,

> the policy underlying Rule 408 is clear. The rule seeks to promote candid settlement talks. "The benefits of such a policy include the reduction of court congestion and of expenditures for courts by avoiding unnecessary lawsuits, and the placing of the conduct of trials on a more ethical footing by the insistence on a modicum of fair play in pretrial maneuvers." 2-408 Weinstein's Federal Evidence § 408.02[1] (2015). The rulemakers have concluded that "[a] broad exclusionary rule is required to achieve such goals." Id. Needless to say, prosecutors would be reluctant to offer compromise pleas if defendants who reject them could place the offered pleas before the jury either as evidence of the defendants' innocence or evidence of weakness in the government's position.

*Id.*; *see also United States v. Verdoorn*, 528 F.2d 103, 107 (8th Cir. 1976) ("it is essential that plea negotiations remain confidential to the parties if they are unsuccessful. Meaningful dialogue between the parties would, as a practical matter, be impossible if either party had to assume the risk that plea offers would be admissible in evidence."). Likewise, the existence of a "fast track" program for drug dealers arrested in the Tenderloin, and their sentences, do not merit consideration for a time-served

sentence here. In the context of immigration cases in border districts, the Ninth Circuit has recognized that the existence of "fast track" programs for some defendants does not require Courts to engage in downward departures for defendants who are arguably similarly situated but not sentenced under such programs:

> In *Marcial-Santiago*, we held that sentencing disparities between defendants prosecuted in districts that offer fast-track programs and defendants prosecuted in non-fast-track districts are not "unwarranted." 447 F.3d at 719. The differences between these defendants' sentences are "justified by the benefits gained by the government when defendants plead guilty early in criminal proceedings." *Id*. Under this logic, a district court may not take fast-track disparities into account in sentencing under 18 U.S.C. § 3553(a)(6) because § 3553(a)(6) directs the district judge to consider only "unwarranted" sentencing disparities.

*United States v. Gonzalez-Zotelo*, 556 F.3d 736, 739 (9th Cir. 2009); *see also United States v. Marcial-Santiago*, 447 F.3d 715, 718-19 (9th Cir. 2006). Indeed, such considerations are contrary to the individualized determination requires by § 3553(a). *See Gonzalez-Zotelo*, 556 F.3d at 741-42.

Finally, protecting the public should be the Court's paramount objective in sentencing this drug dealer. Like any other unlawful employment driven purely by economic gain, the behavior of a drug dealer, like Mr. Mejia-Zeron, is motivated by a simple cost-benefit analysis. This is not youthful indiscretion before the Court, but instead the result of a cold calculus to get himself and his family ahead by praying on the weak and vulnerable persons addicted to fentanyl in this community. Unlike a time-served, or other extremely low sentence, a sentence of 19 months shifts that calculus and sends a message that Mr. Mejia-Zeron, and other drug dealers like him, are better off continuing to seek gainful employment then slipping into the easy money that comes from selling deadly drugs to addicts.

## VIII. CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Mr. Mejia-Zeron to 19 months of imprisonment, three years supervised release, and a $100 special assessment.

DATED: May 9, 2025

Respectfully submitted,

PATRICK D. ROBBINS
Acting United States Attorney

　　　　　/s/
DANIEL N. KASSABIAN
Assistant United States Attorney